15832

RUSH v. THOMPSON

(38 S. E. (2d), 7)

*Messrs. McEachin & Townsend,* of Florence, Counsel for Appellant,

*Messrs. Henry E. Davis, George W. Keels* and *Royall & Wright,* all of Florence, Counsel for Respondent,

April 26, 1946.

MR. ASSOCIATE JUSTICE OXNER delivered the unanimous Opinion of the Court.

This action was commenced on January 14, 1942, by A. N. Rush against J. M. Thompson to recover damages for the alleged fraudulent breach of a contract. About a month later, Thompson instituted an action in equity against Rush for a mutual accounting and the foreclosure of certain mortgages. On a former appeal (203 S. C., 106, 26 S. E. (2d), 411), we held that the trial of "the equity case should be stayed and held in abeyance until the further order of the Court, so as to permit the prior trial and determination of the law case". A statement of the pleadings in

both actions will be found in that opinion. The present action—one at law for the recovery of damages—was tried in September, 1943, and at the close of the plaintiff's evidence, a motion by defendant for a nonsuit was granted, from which the plaintiff has appealed. Before stating or discussing the grounds upon which the nonsuit was granted, we shall give a summary of the material facts shown by plaintiff's testimony.

Rush was engaged in the sale and distribution of gasoline and other petroleum products at Olanta, Florence County. He commenced this business on a very small scale in 1923 as an independent distributor. In 1926, he became the agent in the surrounding territory for the Sinclair Refining Company. Under the terms of the agency agreement with this Company, Rush agreed to sell and deliver its products exclusively and was to receive a certain commission on all products sold. No credit was to be extended to any customer without the written permission of the Company and Rush was made personally responsible for any sale on credit without such permission. He was to furnish at his own expense the equipment and drivers to sell and deliver the Company's products. The agency agreement further provided that it could not be assigned without the consent of the Company and that either party could terminate the agreement at any time with or without cause. The volume of the business was gradually expanded until by 1937 Rush was selling between thirty and forty thousand gallons of gasoline a month and supplying thirty to forty outlets (filling stations). By this time his gross income approximated $600.00 monthly and net income, exclusive of depreciation, $200.00 monthly. The bulk plant from which the petroleum products were delivered, consisting of an office, storage tanks and other equipment, was located on a lot owned by Rush in Olanta. He also personally owned two of the filling stations, one at Turbeville and the other at Lake City. All of this property was leased to Sinclair, the lease on the bulk plant expiring in June, 1941, and that on the two filling stations in 1944. Apparently the other filling stations through

which the Company's products were sold were also under lease to Sinclair. Rush extended credit to some customers without the permission of the Company and through this unwise credit policy became indebted to Sinclair in the sum of approximately $2,200.00. During the latter part of 1937 Sinclair was requesting that this indebtedness be paid or a bond with surety be given to secure its payment. While there is no evidence to show that Sinclair actually threatened to cancel the agency agreement, it is reasonable to infer that unless some satisfactory arrangements had been made to take care of this indebtedness, the Company would have exercised the right to terminate the contract. Such action would have ruined Rush's business, as the bulk plant and all the filling stations were under lease to Sinclair.

Being unable to pay the indebtedness to Sinclair, Rush, during the latter part of 1937, approached Thompson, who was engaged in the mercantile business in Olanta, with the view of securing his consent to act as surety on the bond demanded by Sinclair. The two men had been next door neighbors in Olanta for a period of twelve or thirteen years Their relations were friendly and business transactions between them had been frequent. At this time Rush was already indebted to Thompson in the sum of approximately $2,300.00, representing the balance due on a $3,500.00 note, secured by a mortgage on the bulk plant and other property, given in 1936. Rush received from Sinclair a monthly rental of approximately $75.00 from the bulk plant which was turned over to Thompson to reduce the above indebtedness. Thompson agreed to act as surety on the bond required by Sinclair. His name was approved and the bond forwarded for execution. Rush presented the bond to Thompson for his signature, but Thompson refused to sign it. He stated, however, that he would assist in the matter. Rush thereafter had several conferences with Thompson, extending over a period of several weeks, with the view of getting a definite proposition. Thompson finally stated that he would pay the Sinclair indebtedness provided he was allowed to supervise the business and receive one-half the net profits.

He further required that all commissions from Sinclair be paid direct to him and that he be permitted to make all disbursements. Rush assented to this proposition. Sinclair, however, refused to agree to pay the commissions to Thompson because the agency contract was not in his name. Thompson then suggested to Rush that the agency agreement be changed and put in his name so that the commissions would be paid by Sinclair direct to him. Rush agreed to this and approached two representatives of the Company, Smith and Trego, to secure their approval. Sinclair agreed. Under the final agreement between Rush and Thompson, all commissions were to be paid to Thompson, who was to make all disbursements and receive one-half the net profits; Rush was to continue to do the same work which he had previously done outside of the office and receive the remaining one-half of the net profits of the business. The profits accruing to Rush, however, were not to be paid to him but applied by Thompson on his indebtedness.

In accordance with the above verbal contract, the agency agreement held by Rush was cancelled and a similar one entered into between Thompson and Sinclair Refining Company on January 13, 1938. Thompson paid the indebtedness of approximately $2,200.00 owed by Rush to Sinclair. As part security for its payment, Rush executed and delivered a note and mortgage to Thompson for $1,500.00. It is not altogether clear what security, if any, was given for the remaining $700.00. Rush and Thompson then commenced operating the business under the oral contract which they had made. The bank account of the business was in Thompson's name and he handled all money. Thompson devoted only a small portion of his time to the business. Rush devoted his full time as formerly. He continued to turn over to Thompson, to be applied on the mortgage indebtedness, the rent which he received from Sinclair on the bulk plant. All profits accruing to him under the contract were also applied on his indebtedness to Thompson. He drew no salary from the business. Prior to the new arrangement Rush had only one employee who was a truck driver and salesman. This

employee was retained in the new business in the same capacity. Thompson employed a bookkeeper who kept the office. Rush personally owned a truck, worth about $500.00 when the business was transferred, and also some other equipment of the approximate value of $400.00, all of which was used in the new operations.

Rush and Thompson had their first settlement in May, 1939, or about sixteen months after they started business together. The business up to that time showed a net profit of $3,800.00. In accordance with the verbal contract, one-half of this amount was paid to Thompson and the other half, or $1,900.00, was credited on Rush's indebtedness to Thompson. In the meantime, a new truck was purchased for $852.50 and paid for from the profits of the business. About December, 1939, Rush sought another settlement, but Thompson stated that he was too busy at that time to attend to the matter and requested Rush to come back later. Rush approached Thompson several times thereafter seeking a settlement and finally in March, 1940, Thompson positively declined to make any accounting, stating that Rush "didn't have anything to do with it (the business) anyhow; it was all his". Thereupon Rush stated that he was entitled to an accounting under their agreement, to which Thompson replied that he remembered the agreement, "but he had changed his mind". Rush then made arrangements to pay the balance due on his indebtedness and, accompanied by his attorney, tendered said amount to Thompson upon the condition that Thompson release the business. Thompson stated that he would accept payment of the amount due but unqualifiedly declined to cancel the agency agreement which he had with Sinclair. After this occurred, Rush went to see Mr. Trego, the representative of the Company who handled the transfer of the agency from Rush to Thompson, and asked that the agency be returned to him, to which Trego replied that if Thompson would cancel his contract, the Company "would deal" with him (Rush). Thompson continued to operate under his agency agreement until May, 1941, when he became a "distributor" for Sinclair, buying its

products outright, and no longer worked on a commission basis.

During 1940 or 1941 Thompson, without the permission or knowledge of Rush, traded the truck which had been purchased from the profits of the business and was allowed $400.00 in the trade. The other truck which Rush personally owned was used in the business for a period of about a year when it had to be junked.

Under the foregoing testimony, which for the purpose of this discussion must be accepted as true, was the defendant entitled to an order of nonsuit? The trial Judge granted the motion for a nonsuit on three grounds: (1) That the oral contract was one which it was impossible for the parties to perform in that Thompson agreed, when the indebtedness was paid, "to turn over" the Sinclair agency to Rush which could not be done without the approval of a third party—Sinclair Refining Company; (2) that Rush had sustained no loss because the testimony showed that without the financial aid of Thompson, he would have lost the Sinclair agency; and (3) that there was no evidence of fraudulent acts accompanying the alleged breach of the contract. We do not think the motion can be sustained on either of these grounds and the questions will be discussed in the order in which they have been stated.

It is manifest that there was a verbal contract between the parties. Indeed, this is conceded. The testimony shows that this contract contemplated that upon payment by plaintiff of his indebtedness, defendant would cancel the agency agreement which he had with Sinclair so as to enable the plaintiff to procure an agency agreement in his own name. It is true that the plaintiff alleges in his complaint that the agreement or understanding was "that when the mortgage indebtedness was paid in full, then the defendant would deliver the agency agreement back to the plaintiff, including all delivery equipment and property thereof, and the defendant would have no further interest therein". But the method by which the agency agreement would be delivered "back to the plaintiff" is clearly explained as follows by

plaintiff on cross examination: "He was to check out, cancel his contract with Sinclair whenever I paid him his money; just cancel it. That is the only way he could do, cancel it, unless they cancelled it." Not only has defendant failed to make any effort to have the agency transferred to plaintiff, but when tendered the amount of the indebtedness positively refused to surrender the agency. Certainly until defendant has made every effort to perform the conditions required of him under the terms of the contract, he is not in a position to assert his inability to control the actions of Sinclair, whose cooperation was needed to effectuate the transfer of the agency as contemplated by the parties. Not only did defendant fail to do that which it was possible for him to perform, but he completely repudiated the agreement when called upon to carry out its terms. Moreover, the testimony does not show that Sinclair was unwilling to give plaintiff a new agency agreement, but, on the contrary, the statement of Sinclair's representative to the effect that if defendant cancelled his agency agreement, Sinclair would then "deal" with plaintiff, rather indicates that Sinclair was agreeable to the transfer. At least it was for the jury to determine whether the above statement was subject to such an interpretation. There was nothing unlawful or inherently impossible within the contemplation of this contract.

We shall next discuss the second ground upon which the nonsuit was granted, namely, that except for the aid of Thompson, Rush would have lost the agency and, therefore, sustained no loss. It is not clear whether the trial Judge, in granting the motion on this ground, concluded that the contract was without consideration or that the plaintiff had proved no damages resulting from its breach, but we do not think the testimony supports either conclusion. Rush had built up a profitable business yielding a net income of approximately $200.00 per month. It is true that this income was contingent upon his keeping the agency and had Rush failed to make some satisfactory arrangements with reference to his indebtedness to the Company, Sinclair would

have doubtless exercised the right which it had to terminate the agency at any time. However, we cannot say that the sole inference to be drawn from the testimony is that Thompson was the only person from whom Rush could have secured financial assistance. On the strength of this contract, Rush requested Sinclair to transfer the agency to Thompson and delivered to the new business certain equipment which he personally owned and in which Sinclair had no interest. From this business' Thompson received almost $2,000.00 during the first sixteen months of operation. There was not included in the net income of the business a truck costing $852.50 which Rush and Thompson purchased from the profits. Under the agreement between the parties Rush had a half interest in this truck. Notwithstanding this, Thompson subsequently appropriated the truck to his own use. Clearly there is no basis for the conclusion that the contract was without consideration. Equally untenable, we think, is the contention that Rush has not been damaged as a result of the breach. As the case must be remanded for a new trial, we think it better to refrain from a discussion of the elements of damage which might be recovered.

There remains for consideration the third ground upon which the motion was granted—that there was no evidence of fraudulent acts accompanying the breach. Counsel for plaintiff vigorously assail the correctness of this conclusion of the lower Court. But it is unnecessary for us to now decide whether there was evidence of fraud so as to require the submission to the jury of the issue of punitive damages. We leave that questioned undetermined. The nonsuit was granted as to all damages. Even if there had been a failure to prove fraud (and we do not mean to intimate there was), such would not have precluded the recovery of actual damages. *Broome v. Travelers Insurance Co.*, 183 S. C., 413, 191 S. E., 220; *Jones v. Metropolitan Life Insurance Co.*, 206 S. C., 139, 33 S. E. (2d), 384.

There are certain other exceptions of plaintiff but on this appeal we find it unnecessary to pass upon them.

During the trial of the case defendant's counsel objected to all testimony relating to the oral contract in question on the grounds (1) that it varied and contradicted the terms of the written agency agreement, and (2) that "the testimony adduced sought to establish by parol a mortgage of something that was incapable of being mortgaged." We think both of these grounds are clearly untenable and that this testimony was properly admitted.

In conclusion, it may not be amiss to state that the facts discussed are, of course, taken from the plaintiff's testimony which we must assume to be true in passing on the motion for a nonsuit. On another trial of the case the credibility of this testimony, as well as any that may be offered by defendant, will be determined by the jury.

Judgment reversed and the case remanded for a new trial.

MESSRS. ASSOCIATE JUSTICES STUKES and TAYLOR and MESSRS. ACTING ASSOCIATE JUSTICES J. HENRY JOHNSON and G. DUNCAN BELLINGER concur.